(83 App. Div. 358.)

### GANS v. WEINSTEIN et al.

(Supreme Court, Appellate Division, First Department. May 15, 1903.)

1. BANKRUPTCY—FRAUDULENT SALES—EVIDENCE.

Prior to a debtor's bankruptcy, he was a resident of New York, but engaged in business in Pennsylvania and operated a department store in Helena, Mont. The business in Helena had been unsatisfactory, and in January, 1899, an attorney was sent from New York to dispose of the same. Prior to this, the goods had been inaccurately inventoried at $28,000. The attorney sold the goods (some of which were shopworn and undesirable) to defendants for $7,500, after telling them that the owner's business had been unsatisfactory, and that he desired to withdraw by reason of ill health. Defendants, on the advice of their attorney, demanded and received a bond to indemnify them against any costs in defending their right to the goods; but at that time there was no evidence that the owner was insolvent or was indebted, except for claims in Helena, which were paid from the purchase price of the sale. *Held*, that such facts were insufficient to sustain a finding in a suit by

the vendor's trustee in bankruptcy that the sale was made with intent to defraud the seller's creditors.

Patterson and Laughlin, JJ., dissenting.

Appeal from Special Term, New York County.

Action by Howard S. Gans, as trustee in bankruptcy of Morris Moses, against Samuel Weinstein and others, to set aside an alleged fraudulent conveyance of property. From a judgment (75 N. Y. Supp. 155) in favor of plaintiff, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Clarence G. Galston, for appellants.

Paul M. Herzog, for respondent.

INGRAHAM, J.   The complaint in this action, which is brought by the trustee in bankruptcy of Morris Moses, a resident of the state of New York, alleges that on the 30th day of January, 1899, the bankrupt was carrying on business in the city of Helena, Mont., and was the owner of a stock of goods of the fair value, in the aggregate, of over $28,000; that on or about the 27th day of February, 1899, Moses was insolvent, within the meaning of the bankruptcy act; that on or about that date Moses, with intent to hinder, delay, and defraud creditors, and well knowing that the fair value of the said goods, wares, and merchandise was in excess of $28,000, sold, assigned, and delivered the said merchandise to the defendants for the sum of $7,500, or thereabouts, the said defendants well knowing that the said Moses was insolvent, and that said sale and transfer were made by him with the intent to hinder, delay, and defraud his creditors, and that the defendants purchased the said goods, wares, and merchandise for the sum of $7,500, or thereabouts, and paid said sum therefor, with the intent on the part of said defendants to hinder, delay, and defraud the creditors of Moses; and that the said defendants entered into the possession of the said goods, wares, and merchandise, and still hold them, or the proceeds thereof, for their own sole use and benefit.

These allegations of the complaint were denied, but on the trial the court found that the sale by Moses to the defendants was made with the intent to hinder, delay, and defraud the creditors of Moses, which was well known to the defendants at the time of the sale, and the said sale "is adjudged and decreed fraudulent, null, and void as against the plaintiff and as against the creditors of the said Morris Moses, and is hereby set aside."   It appeared that in the year 1898 the bankrupt, although a resident of the state of New York, and engaged in business in the state of Pennsylvania, being interested in several stores in that state, started what is called a "department store" at Helena, Mont.   The business in Montana was in charge of a manager, and had not been conducted satisfactorily, and was not profitable.   In January, 1899, an attorney from New York went to Montana for the purpose of closing out this business.   He entered into negotiations with several persons engaged in the same business in Montana to sell the entire stock at Helena.   At this time the credit of the bankrupt was good, and, so far as appears, there was no

suspicion that he was insolvent. He was indebted in Montana, the
exact amount of which does not appear; but, so far as it does appear,
all his debts there were paid out of the proceeds of the sale of this
business. The stock of goods at Helena was inventoried as of the
value of about $28,000, but the evidence is undisputed that this in-
ventory was quite inaccurate, both as to the amount of goods and
their value. There is evidence that the manager of the bankrupt at
Helena had, after the taking of this inventory, disposed of a con-
siderable amount of the goods in stock; and an examination of the
stock by proposed purchasers disclosed that it consisted of an or-
dinary stock of goods, usual in a store of this kind, portions of
which had been sold. Some of it was shopworn, and it does not ap-
pear to have been a desirable stock of goods. The representative
of Moses, when he arrived in Montana, endeavored to obtain a pur-
chaser for the goods. He finally induced the defendants to make an
offer for the whole stock of $7,500. After this offer was made, it
appeared that about $800 worth of goods which had been shipped to
the bankrupt, had not been delivered by the railroad company, and
the railroad company refused to deliver them for some reason not
clearly disclosed, when it was agreed that this $800 should be de-
ducted from the contract price; that amount to be paid only in case
the purchaser succeeded in obtaining from the railroad company the
goods held by them. The bankrupt was indebted to a bank in
Helena in the sum of $2,500, which the bankrupt's representative
agreed to pay from the purchase price of the goods, and other debts
owed in Helena were also paid by the bankrupt's representative.
During the negotiations the defendants consulted their counsel, who
advised them that, in purchasing such stock of goods, there might
be complications arising from the claims of creditors in Montana or
the shippers of goods to the bankrupt, and advised the purchasers
not to make the purchase unless they had a bond of indemnity to
indemnify them against such claims; and it was finally agreed that
such a bond should be furnished by the bankrupt, which was sub-
sequently done. There is no evidence that the defendants had any
suspicion that the vendor was insolvent or unable to pay his debts,
or that his business affairs in Pennsylvania were not in a flourishing
condition. The reason given to them for this sale was that the bank-
rupt was dissatisfied with the way in which his affairs had been man-
aged in Helena; that he was in bad health and desired to withdraw
from business. It is not disputed but that the defendants paid the
purchase price, $7,500. The amount realized was used in paying the
debts of the bankrupt in Helena, the balance being sent to H. B.
Claflin & Co. in New York. Just what interest they had in the trans-
action, does not appear. This transaction was finally closed on the
30th day of January, 1899. The defendants paid the money to the
representative of the bankrupt, and immediately took possession of
the goods, removing them to their own store. Subsequently, in
March, 1899, upon a petition of Moses' creditors in New York, he
was adjudicated a bankrupt, and the plaintiff was duly appointed his
trustee.

There is no direct evidence that Moses was insolvent at the time

of this transaction, nor is there evidence to show that the defendants had knowledge of circumstances which would charge them with knowledge of his insolvency at the time of the transaction. The witnesses called by plaintiff, as well as those called by defendants, testified that at the time of this transfer Moses was reputed to be solvent; and, while it is true there were some unpaid claims against him at Helena, it does not appear but that the value of his property, putting it at the price that the defendants paid for it, was much more than sufficient to pay all his debts there. A representative in Helena of a commercial agency testified that their investigations in New York and Philadelphia affecting Moses showed that he was amply responsible, and that the only knowledge that they had that would justify a suspicion was the fact that he was not prompt in the payment of his Montana indebtedness, but there is no evidence to show that the defendants had any knowledge of that fact. The bank in which this Montana business was a depositor had loaned the bankrupt a considerable sum of money, which was paid out of the proceeds of this sale to the defendants. The cashier of that bank testified that he considered Moses perfectly responsible, and that the indebtedness, which consisted of a discount of a note, was not due at the time of this sale. It is not disputed but that these defendants were solicited to purchase the property by Moses' representative, and were only induced to make the purchase after considerable solicitation, and that they made it with some reluctance. There is nothing in the whole case that would justify a suspicion against them, except the advice that they received from their counsel. Considering the circumstances under which this sale took place, the absence of Moses, who was making this sale through an attorney, and that he was a nonresident, engaged in business in New York and Pennsylvania, the fact that the defendant's legal adviser suggested a possibility of complications which would cause the purchasers an expense in defending their right to the goods, and that they should be indemnified from the cost of such an attack, was not sufficient to justify a finding that they knew, or had reason to know, that Moses was at the time insolvent, or that this transfer was made with intent to hinder, delay, and defraud their creditors. I am not at all satisfied from this evidence that this stock of goods, taken as a whole, was really worth more than that paid for it by the defendants. Certainly the inadequacy of price was not sufficient to justify a finding that the defendants must have known that the sale was made with some unlawful intent. The goods had been examined by several proposed purchasers, but, so far as appears, the defendants were the only ones that could be induced to make any offer for them; and assuming the facts as stated to the defendants to be true—that Moses was in bad health, and was engaged in business in New York and Pennsylvania; that his business in Montana had been unsuccessful, and its management not satisfactory; that the inventory price taken on the 1st of January was $28,000; that a considerable portion of the stock had been dissipated since that inventory was taken, and the character of the stock—it certainly is not at all clear but that the amount realized was as much as could have been realized in any other way, and was

the fair value of the property sold in bulk, under the circumstances that the sale was made. Certainly the advertisements of the sale of the stock of goods are not to be taken seriously.

My conclusion from a review of the evidence is that the finding that this sale was made with intent to hinder, delay, and defraud creditors, and that the defendants were chargeable with knowledge of such intent, was not sustained by the evidence, and that the judgment appealed from should therefore be reversed, and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and McLAUGHLIN, J., concur. PATTERSON and LAUGHLIN, JJ., dissent.